IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

QONTAE BOLTON, et al.,            }
                                  }
    Plaintiffs and                }
    Counterclaim defendants,      }    CIVIL ACTION NO.
                                  }    04-AR-3163-S
v.                                }
                                  }
DURABLE MEDICAL EQUIPMENT         }
RENTAL & SALES, INC., et al.,     }
                                  }
    Defendants and
    Counterclaimants.

**MEMORANDUM OPINION**

The court has before it the motion for summary judgment filed by defendants and counterclaimants, Durable Medical Equipment Rental & Sales, Inc. ("DME"), and Pete Allen, III, the president of DME, seeking summary judgment on all claims brought by plaintiffs and counterclaim defendants, Qontae Bolton ("Bolton") and Iris Johnson ("Johnson"). Plaintiffs allege that they were wrongfully terminated from their employment with DME, invoking 42 U.S.C. § 1981. Bolton brings three additional claims against both defendants: retaliatory interference with her right to contract, invoking 42 U.S.C. § 1981; defamation; and intentional interference with business relations. For the reasons that follow, summary judgment will be granted as to the claim for intentional interference with business relations, but denied as to all other claims. There is no motion for summary judgment by counterclaim defendants challenging the jury triability of the counterclaims.

***Summary Judgment Facts***[1]

DME is a medical supply company servicing Birmingham, Alabama. In 2003, Pete Allen ("Allen"), a white male, joined DME, the company formerly run by his father. At that time, DME was experiencing financial difficulties, so Allen, as president and majority shareholder,[2] decided that he needed to streamline the workforce. He made the decision to terminate both Johnson and Bolton on June 15, 2004 as part of a reduction in force ("RIF"). Johnson, a black female, had previous experience in medical billing, and her duties at DME had consisted of billing, customer service, and purchasing equipment. DME says that Johnson was selected for the RIF because DME had received complaints about her attitude toward customers, and she had behaved rudely towards her co-workers as well. Bolton, another black female who was a probationary employee at the time of her termination, had been employed as a file clerk. She was allegedly selected for the RIF because of her probationary status and because Allen determined that she could not be trained to complete more difficult tasks than

---

[1] Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.Pro. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In assessing whether the movant has met its burden, the court must view the evidence, and all inferences drawn therefrom, in the light most favorable to the nonmovant. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993). In accordance with this standard, this statement of facts includes both undisputed facts and, where there is a dispute, the facts according to the nonmovant's evidence, and the legitimate inferences therefrom.

[2] Allen owns 51% of DME's stock, while his father's estate retains 49% ownership.

organizing and filing documents. However, Lisa Collins, the DME employee who assisted Allen in the decision to terminate Bolton, thought that Bolton could have been trained to perform billing duties.

Prior to June 15, 2004, the only employees working in the front of DME's store were Johns, Bolton, and Collins, all of whom are black. In approximately May, 2004, a customer entered the store and requested assistance from Darnell Allen, Allen's wife and an employee of DME. While Darnell helped the customer, Bolton says she overheard the customer say, "You sure do have a lot of black people working here." Darnell replied, "We're going to take care of that."

On June 6, 2004, Tammy Moore, a white woman, was hired to perform billing duties at DME. DME's financial condition had not improved at that time. DME hired four additional employees, in various capacities, between June and November of 2004.

On July 27, 2004, Allen returned a confidential survey sent to him by Virginia College, regarding Bolton, a graduate of the college. The text of his letter read:

> Qontae Bolton worked for DME for 88 days. She was hired to update our files and other clerical duties. After several weeks of training it,[sic] was apparent her ability to learn was quite limited. Her employment was terminated before her probation period ended. We recently received a letter from an attorney accusing us of racial discrimination behalf [sic] of Qontae Bolton.
> In response to your survey question: Would you be interested in hiring another Virginia College Employee? The answer would be no.

3

Although Virginia College had previously provided references to aid in Bolton's employment searches, it refused to provide future references after receiving Allen's response. Around the same time, Allen received an anonymous phone call regarding Bolton. After originally refusing to answer the caller's questions, he eventually stated that Bolton would not be eligible for rehire with DME. Bolton has nevertheless been able to obtain employment elsewhere.

### *Analysis*

**I. Wrongful Termination**

**A. Plaintiffs'** *Prima Facie* **Burden**

Because Bolton's and Johnson's wrongful termination claims share operative facts, they can, for the most part, be treated simultaneously. Employing the *McDonnell Douglas* burden-shifting framework for circumstantial evidence, the *prima facie* case for wrongful termination in a RIF case requires: (1) proving that the plaintiff was a member of a protected group and was adversely impacted by an employment decision; (2) proving that she was qualified for her own position or to assume another position at the time of her discharge; and (3) producing evidence from which a reasonable jury could conclude that her employer intended to discriminate against her. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998) (citing *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1208 (11th Cir. 1997)). Defendants do not dispute that

4

Bolton and Johnson have satisfied the first two elements, so their *prima facie* cases turn on whether they have introduced sufficient evidence of discriminatory intent.

Plaintiffs rely on three pieces of evidence to show that defendants intended to discriminate against them in the decision to terminate their employment. First, plaintiffs offer the statement by Darnell Allen that "we're going to take care of that" in response to a customer's remarks about the number of black employees at DME.[3] One reasonable, rational interpretation of her statement is that she intended that she and her husband would reduce the number of minority employees working in the front office. Second, plaintiffs offer evidence that they were passed over for the biller position later filled by Tammy Moore. If each can establish her qualification for this position, this evidence is sufficient to make a genuine issue as to discriminatory intent. *See Jameson v. Arrow Co.*, 75 F.3d 1528, 1532 (11th Cir. 1996). Johnson was working in billing when she was terminated and had previously worked in medical billing, while Lisa Collins and Allen disagree on whether Bolton could have performed billing duties, creating a question of fact. Third, plaintiffs introduce evidence that a number of new employees were hired after plaintiffs' termination

---

[3] While defendants are correct that hearsay evidence cannot be considered at the summary judgment stage, it is incorrect that this statement constitutes hearsay, as it is offered to show the state of mind of the declarant. *See* Fed.R.Evid. 803(3).

5

and before DME's financial condition had improved,[4] allowing the jury to infer that discriminatory intent rather than finances drove the decision to terminate plaintiffs.  The court need not judge defendants' proffered explanations for the subsequently hired employees when they have not shown that the financial pressures bearing on DME when plaintiffs were terminated were alleviated prior to taking on the new employees.  Plaintiffs have met their burden under this component of the *prima facie* case.  The totality of the evidence offered by Bolton and Johnson is enough to allow a rational factfinder to conclude that discriminatory intent motivated their termination.

**B.   Pretextual Analysis**

Because plaintiffs have met their *prima facie* burden,  the onus is on defendants to articulate legitimate, nondiscriminatory reasons for the terminations.  If defendants can articulate such reasons,  the burden shifts back to Bolton and Johnson to prove that the proffered reasons are merely a pretext for discrimination.

---

[4] In fact, Bolton and Johnson seek to prove that DME's financial condition deteriorated between June 2004, when plaintiffs were fired, and September 2004.  To do so, plaintiffs rely solely on the balance in DME's checking account on the last day of each month.  Calling this sort of financial analysis "junk accounting" is too kind.  With the amount of variability inherent in a commercial checking account balance, a monthly snapshot gives absolutely no indication of the company's financial condition unless it evinces a *significant* trend.  DME's balances in 2004 indicate no discernible, statistically significant pattern, and thus are useless for a determination of DME's financial viability.
    Although plaintiffs' proof of a deteriorating financial condition is insufficient, it is also unnecessary.  Allen has testified that DME's financial condition forced him to terminate Bolton and Johnson, and defendants have introduced no evidence that the company's position improved between that time and the subsequent hiring period.  That the condition did not improve is enough for plaintiffs' purposes; they need not show that it worsened.

In this analysis, there is reason to distinguish between the two plaintiffs.

As to Bolton, defendants have undeniably met their burden of production, as they proffer the company's ailing financial condition as the impetus behind the RIF. In addition, defendants have introduced evidence upon which a jury could find that Bolton was selected for the RIF because she was a probationary employee, and had been determined by Allen not to be trainable for more difficult tasks than those required by her current position.[5] Bolton must therefore proffer evidence to disprove the justifications for her termination. Darnell Allen's comment weighs strongly in Bolton's favor. In addition, although Bolton does not create an issue of fact as to the primary motivation, DME's poor financial condition, there is no evidence that this condition improved prior to the next round of hiring, creating at least some inference of discrimination. Bolton does create a genuine issue of fact as to the reason why she was selected for the RIF with the introduction of Lisa Collins' testimony regarding Bolton's abilities. It is the exclusive providence of the jury to weigh conflicting testimony and to determine credibility, and thus summary judgment is inappropriate on Bolton's wrongful termination claim.

---

[5] Although plaintiffs offer evidence to the contrary, defendants' burden is one of production, not persuasion, and credibility determinations are improper at this stage in the *McDonnell Douglas* analysis.

Defendants have met their burden of production vis-à-vis Johnson as well. Again, defendants offer that DME's financial condition motivated the RIF, and have introduced evidence that Johnson was selected for termination because of her negative attitude. As with Bolton, the evidence in the record raises a question as to how DME was able to hire a number of additional employees when it professed to be experiencing a financial downturn requiring that it undergo a major RIF. This evidence combined with Darnell Allen's allegedly racist comment sufficiently challenges defendants' motivation for firing Johnson to make a jury issue of pretext.

## II.  42 U.S.C. § 1981 Retaliation

Bolton alleges that defendants interfered with her ability to create new employment contracts when Allen (1) told an anonymous caller that Bolton was not eligible for rehire, and (2) responded negatively to an employment survey sent to him by Virginia College. 42 U.S.C. § 1981 protects the right of all citizens to make and enforce contracts equally, and defines the conduct it regulates to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C.A. § 1981(b). As this court held in its memorandum opinion of December 17, 2004, this statute "allows an action against substantial race-based impediments, or barriers, to contract formation set up by

third parties." Under § 1981, a claim for retaliatory interference with a prospective contractual relationship requires proof that: (1) a former employer actively gave a negative or false reference, (2) with retaliatory intent, and (3) that reference created a substantial barrier to the formation of prospective employment contracts.[6] Under this standard, Bolton has made out a *prima facie* case for retaliation, but only as to the survey responses sent to Virginia College.

Allen's phone conversation, ostensibly with a prospective employer, cannot be construed to indicate retaliatory intent. Bolton admits as much in her brief in response to defendants' motion for summary judgment, in as much as she omits any reference to the phone conversation in the section regarding the retaliation claim. No reasonable jury could find that Allen intentionally retaliated against Bolton when he deflected numerous questions regarding her, but told the truth by admitting that she would not be eligible for rehire. Bolton has not made out a claim under § 1981 as it relates to this communication.

---

[6] In its memorandum opinion, this court held that "a plaintiff who could prove that her former employer, with retaliatory intent, actively gave a negative, or false, reference to a prospective future employer would be entitled to relief under § 1981." Although this language would seem to indicate that any communication would have to be conveyed directly to a prospective employer, the court specifically contemplated Bolton's claim that defendants interfered with her prospective contracts though their interaction with Virginia College, relying on *London v. Coopers & Lybrand*, 644 F.2d 811 (9th Cir. 1981), to find that such conduct is actionable. For that reason, the court has rephrased the *prima facie* burden to implicitly incorporate communications with intermediaries that substantially impact prospective contractual rights with other parties.

As to the survey Allen returned to Virginia College, Bolton has introduced evidence allowing her claim to survive summary judgment.  First, as the court held in its earlier memorandum opinion, Allen's negative review of Bolton's abilities qualifies as active retaliation even though Virginia College sought him out rather than vice versa.  In this way, defendants' argument that they did not send any unsolicited communications is inapposite.  Allen's affirmatively negative, and arguably inaccurate, response regarding Bolton's ability is sufficient.  Second, the genuine issue of whether Bolton's learning ability truly was limited impacts whether it is reasonable to infer discriminatory intent from the survey responses.  This question combined with the statement that DME would no longer hire Virginia College graduates, which could  be construed as vindictive and retaliatory, establishes the second prong of Bolton's *prima facie* case.  Third, Bolton has introduced evidence showing that Allen's survey created a substantial barrier to her ability to form new contracts.  Although Bolton has been able to obtain employment since the survey, she has done so without the benefit of a reference from her alma mater.  The inability to obtain such references is a tangible, appreciable detriment to Bolton's marketability, and is substantial enough to be actionable under § 1981.  Defendants' motion for summary judgment on Bolton's retaliation claim is due to be denied to the extent that it relies on the Virginia College survey.

**III. Defamation**

Bolton asserts a claim for defamation based on the responses contained in the Virginia College survey. To establish her *prima facie* case of defamation, Bolton "must show (1) that the defendant was at least negligent, (2) in publishing (3) a false and defamatory statement to another (4) concerning the plaintiff, (5) which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod)." *Delta Health Group, Inc. v. Stafford*, 887 So. 2d 887, 895 (Ala. 2004) (quoting *Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085, 1091 (Ala. 1988)). Defendants do not dispute the second or fourth elements, nor could they.

Bolton has proffered evidence upon which a rational jury could find that she has proven the other three elements of her *prima facie* case for defamation. First, because there is a factual question as to whether Bolton really had a "limited" ability to learn, the court must assume that Allen was negligent in disclosing that information. Certainly, if Allen had no personal knowledge of her ability and failed to consult Lisa Collins or other DME employees, he was negligent in not doing that research prior to returning the survey. Second, that same factual dispute establishes the third element of Bolton's claim for purposes of summary judgment, because it determines whether the statement

regarding her ability was false. Defendants' reliance on *Eastern Air Lines, Inc. v. Gellert*, 438 So. 2d 923 (Fla. Dist. Ct. App. 1983), for the proposition that opinions cannot constitute defamatory speech is misguided. As discussed in *Gellert*, only "pure opinions," which occur "when the defendant makes a comment or opinion based on facts which are set forth in the [correspondence] or which are otherwise known or available to the reader or listener," *id.* at 927 (citation omitted), are not actionable. "Mixed opinions," which rely on undisclosed facts, remain actionable as defamation. *Id.*; *Sanders v. Smitherman,* 776 So. 2d 68, 74 (Ala. 2000). Allen's survey response cannot be construed as pure opinion, as it concludes that Bolton has limited learning ability without mentioning the facts upon which he bases that opinion. Third, because Allen did not accuse Bolton of committing a crime, Bolton cannot prove defamation *per se*, and thus must prove actual damages. *See Delta Health Group*, 887 So. 2d at 896. The withholding of references is a cognizable injury with a defamation claim just as it is with Bolton's retaliation claim under 42 U.S.C. § 1981.

Although Bolton's *prima facie* case for defamation has been established, defendants assert two affirmative defenses to that claim. First, they assert the absolute defense of truth. As already discussed, there is a factual question as to whether the survey responses were truthful, so the court must assume for

12

purposes of this analysis that they were false.  Second, defendants assert a qualified privilege for communications pursuant to a public or private duty.  It is well established in Alabama that this privilege may extend to communications between a previous and prospective employer. *E.g., Clark v. America's First Credit Union*, 585 So. 2d 1367, 1370 (Ala. 1991).[7]  However, this privilege is vitiated where the plaintiff can prove actual malice, such as "by evidence of previous ill will, hostility, threats, rivalry, other actions, former libels or slanders, and the like, emanating from [the defendant], or by the violence of the defendant's language, the mode and extent of publication, and the like." *Id.* at 1371 (citations omitted).  The hostility created by Bolton's lawsuit resonates in Allen's survey response, as he would have little reason to mention the pending litigation otherwise.  The necessary assumption that Allen misrepresented Bolton's learning ability buttresses the conclusion of actual malice.  As neither of the privileges asserted by defendants attach, summary judgment must be denied as to Bolton's defamation claim.

**IV. Intentional Interference with Business Relations**

The *prima facie* case for Bolton's sate law interference claim contains four elements:

---

[7] Bolton is correct to point out that Virginia College is not a prospective employer, so this claim does not fit the qualified privilege archetype of *Clark*. Nevertheless, the same principles apply in this context, and defendants' assertion of qualified privilege fails on the merits.

13

    (1) The existence of a contract or business relation;
    (2) defendant's knowledge of the contract or business relation;
    (3) intentional interference by the defendant with the contract or business relation; and
    (4) damage to the plaintiff as a result of defendant's interference.

*Lowder Realty, Inc. v. Odom*, 495 So. 2d 23, 25 (Ala. 1986) (citing *Gross v. Lowder Realty Better Homes & Gardens*, 494 So. 2d 590, 597 (Ala. 1986)).[8]  Bolton's claim is based on two separate actions by Allen: mailing the survey to Virginia College, and stating in the phone call that Bolton would not be eligible for rehire.  Because Bolton has failed to present evidence upon which a reasonable jury could find that she has proven the existence of a legitimate contractual or business relationship, summary judgment is due to be granted as to both alleged acts of interference.

    Bolton has introduced no evidence of any actual contractual relationship with which defendants interfered.  However, "[d]efining this cause of action to apply to a 'business relation' as well as a 'contractual relation' allows a plaintiff a remedy in the situation where a defendant has intentionally interfered with a prospective contract as well as when he has interfered with an existing contract." *Ex parte Alabama Dep't of Transp.*, 764 So. 2d

---

[8] Although *Gross*--which first announced this rule of law--articulates the *prima facie* burden as including proof of the absence of justification, it also states that justification is an affirmative defense, and a question to be resolved by the jury. 494 So. 2d at 597 n.3.  Subsequent precedent clarifies that the proper conceptualization of justification places it squarely in the jury's bailiwick. *Odom*, 495 So. 2d at 25; *Sevier Ins. Agency, Inc. v. Willis Corron Corp.*, 711 So. 2d 995, 1002 (Ala. 1998); *see also* 1 Ala. Pattern Jury Instr. Civ. § 10.35.

1263, 1270 (Ala. 2000) (citing Restatement (Second) of Torts, § 766B, cmt.b (1979)). Such a business relationship requires a "legitimate expectancy of the formation of a contract before the alleged tortious act occurred." *Id.* at 1271. Although Alabama courts have interpreted business relationships broadly, *Teitel v. Wal-Mart Stores, Inc.*, 287 F. Supp. 2d 1268, 1280 (M.D. Ala. 2003), purely speculative contractual relationships are insufficient. *Compare Spring Hill Lighting & Supply Co., Inc. v. Square D Co., Inc.*, 662 So. 2d 1141, 1151 (Ala. 1995) (holding that a business relationship existed when a government entity had already accepted a general contractor's bid which incorporated the plaintiff's bid), *with Ex parte Alabama*, 764 So. 2d at 1270 (holding that no business relationship existed when no general contract incorporating the plaintiff-subcontractor's bid had yet been awarded).

Virginia College was not a potential employer for Bolton, and thus no contractual relationship could have been created between Bolton and Virginia College. Bolton must prove that any communication defendants had with Virginia College impacted a business relationship between Bolton and some other party. She asks the court to speculate as to whether the refusal by Virginia College to provide references interfered with her ability to form a future contract. Alabama law on intentional interference with business relations, unlike the law governing § 1981, requires a more concrete relationship than one which *might* be created at some

15

point in the future. Bolton has no legitimate expectation of deriving economic benefits from an undetermined and unnamed prospective employer.

Bolton's claim related to the phone call is just as speculative. While it is a reasonable assumption from the record that the individual calling Allen was a prospective employer, it is not reasonable to infer that the relationship between Bolton and that employer was one in which she had a legitimate expectation of contract formation prior to the telephone conversation. This issue was not briefed by the parties, and the court has not found any admissible evidence in the record indicating which employer contacted Allen, or the stage to which the hiring process had progressed when he was contacted. Such evidence could make the instant case analogous to *Teitel*, and prove that the relationship between Bolton and that specific employer had matured to the point where interference with it would be cognizable. *See Teitel*, 287 F. Supp. 2d at 1281 (holding that a business relationship existed when there was evidence that a prospective buyer who had expressed interest in a piece of real estate decided not to bid on the property at foreclosure specifically because of defendant's actions). Because Bolton has not proffered such evidence, summary judgment is appropriate on her intentional interference claim, and she must seek redress through one of the causes of action which

survive summary judgment.[9]

### *Conclusion*

For the foregoing reasons, summary judgment will be granted by separate order as to Bolton's claim for intentional interference with business relations. Summary judgment will be denied as to all other claims.

DONE this 21st day of February, 2006.

                                      _____
                                      WILLIAM M. ACKER, JR.
                                      UNITED STATES DISTRICT JUDGE

---

[9] Neither defendant has defended itself on the ground that the principal liability of the other could not be imputed to it under a theory of vicarious liability, most likely because the defendants are represented by the same counsel and are functionally the same entity. Certainly, this issue would have relevance within the intentional tort context if this claim did not fail on its merits. However, because the defendants have not raised these issues, the court will not take up the arguments on their behalf.